# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1768

_____

National Labor Relations Board,  *
             *
    Petitioner,    *
             * Petition for Review or Enforcement
   v.       * of an Order of the National
             * Labor Relations Board.
Superior of Missouri, Inc.,   *
             *
    Respondent.   *

_____

Submitted:  September 8, 2003

Filed:  December 9, 2003

_____

Before LOKEN, Chief Judge, McMILLIAN and HANSEN, Circuit Judges.

_____

LOKEN, Chief Judge.

On June 19, 1998, a National Labor Relations Board agent overslept, forcing the postponement of a 6:00 a.m. election to determine whether Teamsters Local Union No. 682 would represent the drivers and helpers employed by Superior of Missouri, Inc.  The election was held one week later, and the Union prevailed.  The Board certified the Union, rejecting Superior's objections to the election without holding an evidentiary hearing.  Superior refused to bargain with the certified Union and petitioned this court for review of the resulting unfair labor practice order, which is the proper way to obtain judicial review of an otherwise unappealable certification order.  See Boire v. Greyhound Corp., 376 U.S. 473, 477 (1964).  We denied

enforcement of the Board's unfair labor practice order and remanded, concluding that the Board erred in overruling Superior's objections to the election without a hearing. NLRB v. Superior of Mo., Inc., 233 F.3d 547 (8th Cir. 2000).

On remand, following an evidentiary hearing, the Board again rejected Superior's objections to the election and reaffirmed its order that Superior violated 29 U.S.C. §§ 158(a)(1) and (5) by refusing to bargain with the certified Union. Superior of Mo., Inc., 338 N.L.R.B. No. 69 (Nov. 20, 2002). Superior again seeks judicial review, arguing that the Board erred in certifying the Union because the election was fatally flawed by the Board agent's misconduct. After careful review of the hearing record, we conclude that the Board's findings and conclusions upholding the election are supported by substantial evidence on the record as a whole. Therefore, we enforce the Board's unfair labor practice order.

## I. The Results of the Evidentiary Hearing

A party that timely objects to an election is entitled to an evidentiary hearing if it "makes a prima facie showing of substantial and material facts which, if true, warrant setting aside the election." Rosewood Care Ctr. of Joliet, Inc. v. NLRB, 83 F.3d 1028, 1031 (8th Cir. 1996). In the first appeal, we concluded that Superior had made such a showing for three reasons. First, Superior presented evidence that employees who gathered to vote in the first election were angry when it was cancelled, and a rumor spread that Superior had paid the Board not to show up. Superior alleged that, despite this prejudicial atmosphere, the Board agent unilaterally rescheduled the election without measuring the impact of his blunder and without consulting the parties who had agreed to the June 19 scheduling. Second, the record contained no evidence that the Union had attempted to explain why the June 19 election was canceled, raising the possibility that the Union had fueled the rumor or had at least taken advantage of its prejudicial impact on Superior. Third, Superior presented employee affidavits stating that some number of bargaining unit employees

changed their vote after the first election was cancelled. See 233 F.3d at 552. We now review how these issues played out at the evidentiary hearing on remand.

1. The hearing established that the Board agent did not unilaterally reschedule the election. On June 19, the agent telephoned Superior some fifty minutes into the scheduled election period to explain that he had overslept due to a power outage. The agent asked Superior's General Manager, Kenneth McAfee, to recall those employees who had left the election site so the election could go forward that day. McAfee refused. The Board agent then telephoned Superior's attorney, apologized for oversleeping, and suggested the election be held one week later. After consulting with his client, counsel called the Board agent and agreed to the June 26 date. The Board agent then posted new election notices that afternoon, without objection by Superior. Three days later, Superior distributed a letter to employees explaining what had happened, apologizing for any inconvenience, and encouraging all employees to vote in the rescheduled election.[1]

2. At the hearing Union representative Timothy G. Ryan testified that, on the morning of June 19, he heard someone in a group of about fifteen employees say that Superior had bought off the Board. Ryan testified:

---

[1]The same attorneys, Michael Linihan and Stephen Maule, represented Superior during the election and in both appeals to this court. The hearing testimony established that Linihan and Maule participated in Superior's decision to accept June 26 as the date of the rescheduled election. Thus, these attorneys misrepresented a material fact when they stated in their brief in the prior appeal that the election was "unilaterally rescheduled by the Board." At oral argument, counsel suggested that Superior had no alternative but to accept the new date suggested by the Board agent. Even if true, that does not excuse counsel's material misrepresentation to this court. However, the Board has not moved for sanctions on the ground that counsel procured an evidentiary hearing with a knowing misrepresentation of fact. We condemn counsel's conduct but elect in this instance not to pursue the question of sanctions *sua sponte*. See generally Chambers v. NASCO, Inc. 501 U.S. 32, 44 (1991).

I stopped dead in my track[s] as I heard it and I said wait a minute, it is unheard of. I told you from the beginning that the National Labor Relation[s] Board is a neutral party in this election, the National Labor Relation[s] Board cannot be bought off. It is unfortunate that, through an act of God, the storm knocked out this gentleman's [the Board agent's] electricity, putting him in the position of his alarm not going off. Guys, we will have this election just as soon as possible. Please get it out of your mind.

Another employee confirmed that this conversation took place. Thus, the Union did not fuel the employee rumor that Superior was responsible for cancelling the election, nor is there evidence the Union attempted to take advantage of this rumor in the rescheduled election. Superior complains that the Union and the Board agent left Superior with the task of explaining to employees why the election had been rescheduled. But there is no evidence that Superior asked the Board agent to supplement his standard notice of the rescheduled election with an explanation or asked the Union for additional help in combating the alleged rumor.

3. At the hearing, Superior failed to prove either that eligible employees were disenfranchised by the election rescheduling, or that the Board agent's oversleeping influenced the employees who voted at the rescheduled election. The employees were given one week's notice of the rescheduled election. At the June 26 election, 63 of 69 eligible employees voted; 41 voted in favor of the Union, 20 voted against the Union, and two ballots were challenged. At the evidentiary hearing, one Superior driver testified that he was unhappy about the delay on June 19 but did not testify that he blamed Superior or altered his vote. Another driver testified that she heard an employee speculate on the morning of June 19 that Superior may have paid the Board not to show. And General Manager McAfee testified that, on June 19, he was concerned that angry employees would blame Superior for the failure of the Board agent to appear that morning. But there was no testimony supporting Superior's pre-

hearing allegation that employees changed their votes to support the Union as a result of the election rescheduling.

## II. Discussion

On appeal, Superior challenges the Board's decision to uphold the election on two distinct grounds. In considering these election issues, it is important to identify the standard applied by the Board as well as our own standard of judicial review.

First, Superior argues that the Board agent's misconduct disenfranchised voters. This issue arises most commonly when a Board agent alters the time period of a scheduled election, for example, by opening the polls late or closing them early. In such cases, the Board has often concluded that it must set aside the election because it cannot determine how many employees may have been excluded or otherwise affected. See Nyack Hosp., 238 N.L.R.B. 257 (1978); B&B Better Baked Foods, Inc., 208 N.L.R.B. 493 (1974); Kerona Plastics Extrusion Co., 196 N.L.R.B. 1120 (1972). Superior attempts to come within the purview of these cases by labeling the election rescheduling as a one hundred sixty-eight hour delay. But like the Board, we conclude that these cases are "inapposite." The Board agent did not unexpectedly reduce the employees' opportunity to vote. The employees were given ample notice of the rescheduled election, and the vast majority of eligible employees voted on June 26. There was simply no evidence at the hearing that any employee was disenfranchised by the Board agent's oversleeping.

Second, Superior argues that the Board agent's misconduct destroyed the "laboratory conditions" essential for a fair election. In considering objections of this kind, the Board focuses primarily on whether an agent's conduct was consistent with the impartiality required for the Board to conduct a fair election:

> The Board in conducting representation elections must maintain and protect the integrity and neutrality of its procedures. The commission of an act by a Board Agent conducting an election which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards we seek to maintain, is a sufficient basis for setting aside that election.

Athbro Precision Eng'g Corp., 166 N.L.R.B. 966, 966 (1967) (subsequent history omitted). We review the Board's application of that standard in a particular case for abuse of "the wide degree of discretion vested in it by Congress regarding representation matters." Millard Processing Servs. v. NLRB, 2 F.3d 258, 261 (8th Cir. 1993) (quotation omitted), cert. denied, 510 U.S. 1092 (1994); see also Sioux Prods., Inc. v. NLRB, 703 F.2d 1010, 1013-16 (7th Cir. 1983); NLRB v. Fenway Cambridge Motor Hotel, 601 F.2d 33, 36-37 (1st Cir. 1979).

In this case, the Board agent did nothing inconsistent with the Board's duty of impartiality when he overslept and then negotiated a new election date with the parties. Superior argues that the Board agent's failure to explain to employees that the Board caused the first election to be canceled was both unfair to Superior and an impermissible delegation of "nonminor official election duties." North of Mkt. Senior Servs., Inc. v. NLRB, 204 F.3d 1163, 1168 (D.C. Cir. 2000). We disagree. First, the Board agent had no affirmative duty under the Board's election procedures to provide such an explanation. A recent Board decision noted that "it would be preferable for Regional Offices to include in any notice of rescheduled election a statement that the election has been rescheduled for administrative reasons beyond the control of the employer or the union." City Wide Insulation of Madison, Inc., 338 N.L.R.B. No. 108 (Feb. 7, 2003). We agree with the admonition, but it does not without more establish an abuse of discretion by the Board in this case. In North of Market, the Board agent delegated an election duty to the union in a manner that compromised the integrity of the election because it "may have given the impression that the Board had ceded significant authority to the Union over the conduct of the

election." 204 F.3d at 1169. By contrast, the Board agent's conduct in this case did not cast doubt on either the Board's neutrality or the integrity of the election.

Second, like the ALJ, we find Superior's claim of resulting unfairness to be substantially overblown. In the week between June 19 and June 26, Superior never asked the Board agent to do anything after he posted the notice of the rescheduled election. Rather than urge the Board or the Union to explain why the election had been rescheduled, Superior distributed a letter to employees explaining the situation, assuring them it "certainly was not due to any fault of your company," and encouraging them to vote on June 26. Absent evidence of Union misconduct, this looks like an employer's tactical decision in a competitive election environment.

Superior nonetheless argues that its evidence of employee anger on June 19 and of an employee rumor that Superior had paid the Board not to hold the election are sufficient reason to set aside the election. But at the hearing, Superior introduced minimal evidence of employee displeasure on June 19, and no evidence suggesting that any voter anger on June 19 carried over to June 26 and affected the election. The Board's administrative law judge found that Superior failed to call witnesses who were directly affected and part of the potential bargaining unit, that the rumor was not attributable to any actions of the Union, and that "the impact of the 'rumor' was negligible at best." These findings are supported by substantial evidence. Based on these findings, the Board concluded that the employee rumor did not warrant setting aside the election, like the rumor in Alladin Plastics, Inc., 182 N.L.R.B. 64 (1970).

We agree that the facts developed at the hearing make the proven impact of the employee rumor in this case virtually indistinguishable from that of the rumor in Alladin Plastics. Accordingly, the Board did not abuse its discretion in declining to set aside the election on this ground. See Deffenbaugh Indus., Inc. v. NLRB, 122 F.3d 582, 586-87 (8th Cir. 1997); Millard, 2 F.3d at 261 (the party challenging an election must "show by specific evidence not only that improprieties occurred, but

also that they interfered with employees' exercise of free choice to such an extent that they materially affected the election results").

For the foregoing reasons, we grant the Board's petition to enforce.

_____